FILED

2016 Apr-27  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**MIGUEL WILLIAMSON,**

                                   *JURY TRIAL DEMANDED*

       **Plaintiff**

    **v.**

**TODD ENTREKIN , SCOTT
HASSELL, SGT. RAGLESS,
STACY SMITH,
DEPUTY HARWOOD, DEPUTY
SHEPPARD, DEPUTY CROME,
DR. THOMAS A. PAGE,
DR. ROGER S. BUCK,
ADRIANNE CRANE,
BRANDI CLAY, MARKETTA
COLLINS, TASHA HOPPER,
BRANDI FORD, and
DOCTOR'S CARE
PHYSICIANS, P.C.**

       **Defendants**

## <u>COMPLAINT</u>

<u>INTRODUCTORY STATEMENT, PARTIES AND JURISDICTION</u>

1.     This is an action alleging that defendants violated plaintiff's constitutional rights, as protected by the Fifth Amendment, made applicable to the states under the due process clause of the Fourteenth Amendment. Plaintiff alleges that defendants were deliberately indifferent to his serious and obvious medical needs. He claims that the named jail personnel were aware of and/or apprised of his

condition, which was so serious as to be obvious to a lay person, and failed to take any corrective action. He further claims that the medical providers, including doctors and nurses named as defendants (collectively referred to as the "medical defendants") failed to do any tests to determine his condition, allowing it to worsen to the point where he suffered a heart attack, his kidneys shut down and he nearly died. He continues to suffer from medical problems caused by the acts and failures complained of. Plaintiff further alleges that those defendants failed to meet the standard of care expected of them, causing him the injuries noted.

2.      Plaintiff is currently a resident of Connecticut. He was born in Jamaica and was, at all times relevant to this complaint, confined in the Etowah County Detention Center (ECDC) in Gadsden, Alabama in the Middle Division of the Northern District of Alabama. ECDC has a contract with the United States Marshals Service to house federal "detainees," including those "awaiting a hearing on their immigration or deportation." Plaintiff was, at the time of his incarceration at ECDC, awaiting an immigration hearing.

4.      Defendant, Todd Entrekin, is and was at all relevant times, the sheriff of Etowah County, Alabama. As such, pursuant to Ala. Code § 14-6-1, he "has the legal custody and charge of the (ECDC) and all prisoners committed thereto." He

was, at all relevant times, acting under color of state law. He is sued in his individual capacity.

5.      Defendant, Scott Hassell, is and was at all relevant times, the Chief Deputy of Detention in the Etowah County Sheriff's Office. As such, he is the principal officer responsible for insuring the care of ECDC inmates. He was, at all relevant times and for all his relevant actions, acting under color of state law. He is sued in his individual capacity.

6.      Defendants Ragless, Smith, Harwood, Crome and Sheppard were, at all times relevant, Etowah County Sheriff's Department employees working at ECDC. All their actions, or inactions, complained of herein were done under color of state law. They are sued in their individual capacities.

7.      Defendants Thomas A. Page and Roger S. Buck were, at all relevant times, physicians employed by Doctor's Care Physicians, P.C. who were supposed to provide medical care and service to the inmates at ECDC. They were not employees of Etowah County but were performing duties pursuant to a contract between Etowah County and Doctor's Care Physicians, P.C., by whom they were employed, and were thus acting under color of state law. They are sued in their individual capacities.

8.     Defendants Adrianne Crane and Brandi Clay were, at all relevant times, registered nurses employed by Doctor's Care Physicians, P.C. who were supposed to provide medical care and service to the inmates at ECDC. They were not employees of Etowah County but were performing duties pursuant to a contract between Etowah County and Doctor's Care Physicians, P.C., by whom they were employed, and were thus acting under color of state law. They are sued in their individual capacities.

9.     Defendants Marketta Collins, Tasha Harper and Brandi Ford were, at all relevant times, licensed practical nurses employed by Doctor's Care Physicians, P.C. who were supposed to provide medical care and service to the inmates at ECDC. They were not employees of Etowah County but were performing duties pursuant to a contract between Etowah County and Doctor's Care Physicians, P.C., by whom they were employed, and were thus acting under color of state law. They are sued in their individual capacities.

10.     Defendant, Doctor's Care Physicians, P.C. (DCP) is, and was at all relevant times, a professional corporation providing medical services. In particular, it was contracted to meet the needs of those incarcerated at ECDC. In that capacity, it was required to take care of plaintiff during the term of his incarceration. The actions or inactions of its employees were thereby done under color of state law as

they were all acting pursuant to a contract entered into with Etowah County, Alabama.

11.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983, as well as 28 U.S.C. §1343(a)(3) and 28 U.S.C. §1331. In addition, plaintiff invokes this Court's supplemental jurisdiction under 28 U.S.C. §1367(a). Venue is appropriate as all actions complained of occurred in Etowah County, Alabama in the Middle Division of the Northern District of Alabama.

FACTS

12.     Plaintiff arrived at ECDC early in 2014. At the time of his arrival, he was in good health and not suffering from any significant physical problems or ailments.

13.     On, or about, May 8, 2014 Sandra Clahar, who is now plaintiff's wife, received a telephone call from plaintiff's cell mate, advising that plaintiff was very sick.

14.     On, or about, May 19, Ms. Clahar received a message from plaintiff's cell mate's girl friend to the effect that plaintiff was extremely ill and not receiving any medical attention because the medical request box was full. In response, Ms. Clahar called ECDC. She spoke with defendant Ragless, telling Ragless what she had learned and advising that plaintiff needed medical attention. Ragless said that

plaintiff had to put in a medical request and Ms. Clahar explained that she understood the medical request box was full and officers were not listening to plaintiff's cell mate. She asked Ragless to check on plaintiff and was told that he would be taken care of if anything was wrong. Ragless then hung up. She called back twice and both times Ragless hung up without engaging in any further conversation. Plaintiff alleges that Ragless made no effort to determine if there was any truth to the concerns Ms. Clahar expressed.

15.    Ms. Clahar called ECDC the next day and spoke with defendant Sheppard, who assured her that he would check on plaintiff. Plaintiff's cell mate called Ms. Clahar to tell her that plaintiff had not seen a doctor and that he was urinating blood. Plaintiff alleges that Sheppard failed to check on him, or have him looked at, despite his being informed of plaintiff's dire condition and his promise to Ms. Clahar.

16.    Ms. Clahar next talked to defendant Harwood, who promised to check on plaintiff and asked her to call him back. When she called back, she was told that plaintiff was refusing his medication. Harwood assured her, however, that plaintiff was not in any distress. He further assured her that he had spoken to plaintiff. Plaintiff alleges that, at the time Harwood claims to have talked to him, his serious physical condition and the need for medical attention was evident.

17.     Next, Ms. Clahar called the ECDC and asked to speak to a supervisor. She was connected with defendant Hassel and explained to him what was happening. Plaintiff was then taken to the jail medical unit where he was examined by one of the medical personnel, but he was returned to his cell that night without receiving any treatment. Rather, he was accused of lying about his condition.

18.     Ms. Clahar then heard from another inmate, who said that plaintiff was dying and was not being administered to.

19.     Ms. Clahar called the ECDC several times to check on plaintiff. She spoke to defendants Crome, Smith, Taylor and Sheppard. None were responsive to her concerns. On the contrary, they mocked her for calling so often and, plaintiff alleges, failed and refused to take any action to determine plaintiff's condition or needs or to report to any medical personnel the concerns being expressed.

20.     Because she was being told different things by inmates and jail personnel, Ms. Clahar decided to visit. She made arrangements with defendant Harwood on May 24, a Sunday, to visit plaintiff on May 27. He also told her plaintiff had been seen by a doctor and was well. She flew from her home in Connecticut to Gadsden the next day. She went to the jail and waited for at least an hour. She was finally told by an officer whose name she does not know that

plaintiff refused to see her. Plaintiff did not ever say or otherwise indicate he did not want to see Ms. Clahar.

21.     After she was told plaintiff did not want to see her, Ms. Clahar left the ECDC. As she was leaving, she heard other inmates calling to her, saying plaintiff was dying and was being denied any help. She then called defendant Hassel and said that plaintiff needed to be taken to the hospital. After she spoke with him, she was crossing the street when both jail personnel and local police accosted her and threatened her with arrest for causing a commotion in the jail leading to someone escaping. She explained why she was there and a police officer told her to return to her hotel, promising to investigate.

22.     That night, at about 11:00 p.m., Ms. Clahar received a call telling her an inmate had been rushed to the hospital. It turned out that inmate was plaintiff , who was taken to the hospital that night after suffering a heart attack. In addition, his kidneys had shut down and he required dialysis.

23.     Plaintiff was hospitalized for a full month and nearly died.

24.     The initial cause of plaintiff's problems was a urinary tract infection which remained untreated for an indeterminate length of time but at least several weeks. As a consequence of the failure to treat, the infection spread throughout plaintiff's body, causing pyelonephritis sepsis. Early and appropriate treatment

would have resolved the infection quickly before it spread and before plaintiff suffered multiple heart attacks and a shutdown of his kidneys, with the consequent ongoing medical problems.

25.    Plaintiff is not circumcised, a fact which increases his susceptibility to urinary tract infections. This is a matter of common knowledge such that any trained medical provider, including the medical defendants, would be expected to know it and to have taken it into consideration when diagnosing plaintiff.

26.    Plaintiff alleges, on information and belief, that the medical defendants all had the opportunity to examine plaintiff or were otherwise apprised of his medical complaints and failed to examine, diagnose and/or treat his infection before it spread.

27.    For years, ECDC has been known to systematically abuse immigration "detainees." For example, a report by Community Initiatives for Visiting Immigrants in Confinement (CIVIC), a non-governmental, 501(c)(3) national organization seeking to end isolation and abuse of immigration "detainees," alleges there is ongoing, rampant abuse at ECDC at the hands of both ECDC guards and Immigration and Customs Enforcement (ICE) personnel. ICE agents have been accused by numerous "detainees," of threatening and beating them for refusing to sign deportation papers. Lack of training and a severe shortage

of personnel among ECDC guards is reported to have caused significant problems. According to the CIVIC report, deputies routinely work 12-hour shifts, often for five days at a time and, despite a severe shortage of personnel, are permitted to watch movies and use their cell phones while at work. The result is a chronic failure to properly supervise and protect the inmates of which both Entrekin and Hassell were aware.

28.    In addition, according to a report in *Weld for Birmingham*, a weekly newspaper, at least two other inmates have suffered severe illness while at ECDC. One, Teka Gulema, contracted an infection while there that paralyzed him from the neck down and eventually killed him. Another, Hughes Alexander, was diagnosed with stomach cancer and released immediately before he was to begin chemotherapy. Based upon these incidents and reports, plaintiff alleges that it is a custom, policy or practice at ECDC to ignore or refuse to treat inmates' severe medical conditions whether through neglect, intentional misconduct or in order to avoid the costs of providing necessary and proper treatment. He further alleges that inmates are either not seen by medical staff or are given only perfunctory examinations that fail to diagnose treatable conditions before they become severe or life-threatening.

29.    Based upon the long history of abusive and harmful conditions at ECDC, plaintiff alleges that Entrekin and Hassell knew of the problems there and, despite their knowledge, failed to take the necessary steps to protect inmates. Their failure to properly train and supervise subordinates and to otherwise insure the safety of the inmates in their charge proximately caused the injuries to plaintiff complained of in this complaint.

30.    As a consequence of the neglect and indifference to which plaintiff was subjected, plaintiff suffered the following injuries: the heart attack noted above; the shutdown of his kidneys noted above; continuing medical problems; pain and suffering; severe emotional distress.

## FIRST CAUSE OF ACTION

31.    Plaintiff adopts and incorporates by reference the preceding allegations.

32.    The defendants were all apprised of plaintiff's serious medical condition. His condition was obvious to other ECDC inmates in that he was weak, urinating blood and unable to go to the toilet without assistance. The condition was obvious to lay people, including other inmates, and should have been obvious to defendants. No competent medical provider could have failed to observe it. Defendants were deliberately indifferent to plaintiff's condition over the course of

several weeks and that indifference was the proximate cause of the sepsis, heart attacks, kidney failure and ongoing medical problems.

**WHEREFORE,** plaintiff seeks the following relief:

1.     Such compensatory and punitive damages against defendants, separately and severally, as a jury may determine;

2.     Pursuant to 42 U.S.C. § 1988, his costs and reasonable attorney fees for pursuing this action; and

3.     Such other, further and different relief as to which he may be entitled.

## SECOND CAUSE OF ACTION

33.     Plaintiff adopts and incorporates by reference the preceding allegations. DCP, by and through it employees and agents, including the medical defendants (Page, Buck, Crane, Clay Collins, Harper and Ford) described above, had a legal and contractual duty to provide plaintiff with reasonable medical care that met with the applicable standards of care for similarly situated healthcare providers.

34.     The medical defendants and/or DCP, by and through its employees, including physicians (MD), registered nurses (RN), certified nurse practitioners (CNP) and certified nurse assistants (CNA), breached their duties to provide

appropriate physician and nursing care, services and treatment to plaintiff and that these violations were the proximate cause of plaintiff's injuries and damages.

35.    The breaches of the applicable standard of care committed by the medical defendants and/or DCP's employees and agents constituted negligent and/or wanton conduct that was beneath the standard of care for similarly situated healthcare providers. These acts or omissions by the medical defendants and/or DCP's employees and agents, included, but were not limited to the following:

a) the failure to provide reasonable physician care to plaintiff in conducting adequate and timely assessments and patient examinations; failure to provide reasonable evaluations and treatment; failure to provide appropriate medical diagnoses and interventions; failure to provide appropriate monitoring of plaintiff's condition; and failure to take steps necessary to avoid the predictable deterioration of plaintiff's condition and injuries;

b) the failure to provide reasonable nursing care to plaintiff at all times relevant to this case, including those times that the nursing staff received reports of plaintiff's requests for treatment from plaintiff directly and/or from the defendant guards and/or from other inmates; failing to perform reasonable and timely nursing assessments and patient examinations; failure to notify plaintiff's physicians of plaintiff's condition; failure to carry out physician orders relating to plaintiff;

failure to follow the DCP policies, rules and regulations; failure to follow the Department of Homeland Security's Immigration and Customs Enforcement policies, rules and regulations for the provision of nursing and patient care; and failure to monitor plaintiff's condition;

c)   The failure to render adequate healthcare to plaintiff on the occasions described above in accordance with DCP's policies and procedures, regulations, and/or pursuant to its contractual obligations with U.S. Department of Homeland Security, Immigration and Customs Enforcement and ECDC.

36.   Each of these failures, individually and cumulatively, resulted in the deterioration of plaintiff's condition and ultimately contributed to cause his heart attacks and other serious health conditions described above.

37.   As a proximate result of the negligent and/or wanton acts and omissions committed by the medical defendants and/or DCP's employees and agents as described above, plaintiff suffered heart attacks, kidney failure requiring dialysis, widespread infection and pyelonephritis sepsis and continues to suffer from health problems caused by those acts.

38.   Reasonably prudent healthcare providers, operating under the same or similar conditions, would not have committed the acts and omissions in plaintiff's care as described above. Each of the foregoing acts or patterns of negligence and/or

wantonness on the part of the medical defendants and/or DCP proximately contributed to cause the injuries and damages to plaintiff as described above.

**WHEREFORE,** plaintiff seeks the following relief:

1.     Such compensatory and punitive damages against defendants, separately and severally, as a jury may determine; and

2.     Such other, further and different relief as to which he may be entitled.


      /s/ David Gespass
David Gespass
GESPASS & JOHNSON
P.O. Box 550242
Birmingham, AL 35255-0242
205-323-5966
205-323-5990 (fax)
pass.gandjlaw@gmail.com


      /s/ Alan B. Lasseter
Alan B. Lasseter
SHUTTLESWORTHLASSETER LLC
2100 Morris Avenue
Birmingham, AL 35203
205-322-1411
205-328-1411
alan@lasseterlaw.com
Attorneys for Plaintiff


***PLAINTIFF DEMANDS TRIAL BY JURY***